IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BRISTOL-MYERS SQUIBB CO., E. R. SQUIBB & SONS L.L.C., ONO PHARMACEUTICAL CO., LTD., and TASUKU HONJO, | ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 17-1029-GMS |
| | ) | |
| EMD SERONO, INC., MERCK KGaA, and PFIZER INC., | ) ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendants. | ) | |
| PFIZER INC., WYETH LLC, GENETICS INSTITUTE, LLC, EMD SERONO, INC., and MERCK KGaA, | ) ) ) | |
| | ) | |
| Counterclaim Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BRISTOL-MYERS SQUIBB CO., E. R. SQUIBB & SONS L.L.C., ONO PHARMACEUTICAL CO., LTD., and TASUKU HONJO, | ) ) ) ) | |
| | ) | |
| Counterclaim Defendants. | ) | |

**ANSWER, AFFIRMATIVE DEFENSES,
COUNTERCLAIMS, AND DEMAND FOR JURY TRIAL**

EMD Serono, Inc. ("EMD"), Merck KGaA ("Merck"), and Pfizer Inc. (collectively with

Genetics Institute, LLC and Wyeth LLC, "Pfizer") (EMD, Merck, and Pfizer collectively

referred to as "Defendants"), for their Answer and Affirmative Defenses to the Complaint filed

by Bristol-Myers Squibb Co. ("BMS"), E. R. Squibb & Sons L.L.C. ("Squibb"), Ono

Pharmaceutical Co., Ltd. ("Ono"), and Dr. Tasuku Honjo ("Honjo") (collectively referred to as

"Plaintiffs"), hereby state as follows.

## ANSWER

1.      Defendants deny the allegations in the first sentence of Complaint Paragraph 1, as the cited webpage does not appear to exist.  Defendants admit that cancer is a disease and that it can result from the mutation of one or more cells that were once normal and the subsequent uncontrolled proliferation of those mutated cells.  Defendants admit that the human immune system sometimes has the ability to eliminate or slow the proliferation of certain cancer cells, and that its ability to do so can be downregulated by certain cancer cells by the expression of certain proteins.  Defendants admit the allegations in the fourth sentence of Complaint Paragraph 1.  Defendants admit that certain cancer treatments seek to decrease tumor growth and metastasis.  Except as specifically admitted, Defendants deny the allegations in Complaint Paragraph 1.

2.      Defendants admit that this case relates to their BAVENCIO® (avelumab) product, a groundbreaking treatment for certain forms of cancer, and that treating cancer patients with BAVENCIO® (avelumab) falls within a field called cancer immunotherapy.  Defendants further admit that the field of immunotherapy has added a host of new weapons in the fight against cancer that augment more traditional cancer treatments like surgery and radiation.  Defendants further admit that treatments within the field of immunotherapy seek to use one or more aspects of the human body's immune response to help fight cancer.  Except as specifically admitted, Defendants deny the allegations in Complaint Paragraph 2.

3.      Defendants admit that the human immune system is formed of organs, specialized cells, and substances that work to protect individuals from certain infections and diseases.  Defendants admit the allegations in the second sentence of Complaint Paragraph 3.  Defendants admit that a major function of activated T cells is to try to destroy pathogens or malignant cells

while not harming healthy cells, that to function properly activated T cells must be able to distinguish healthy cells from pathogens or malignant cells, and that T cells can be activated or deactivated via various receptors.  Defendants further admit that one receptor carried on the surface of activated T cells is a protein that has been named the PD-1 receptor, for programmed death-1 receptor, and that this protein was misnamed as a result of its initial association with cell apoptosis.  Defendants admit the allegations in the fifth, sixth, and seventh sentences of Complaint Paragraph 3.  Except as specifically admitted, Defendants deny the allegations in Complaint Paragraph 3.

4.      With respect to the first sentence of Complaint Paragraph 4, Defendants admit that PD-L1 was first isolated from a tumor and was subsequently found to be expressed on the surface of numerous types of cancer cells.  With respect to the allegations in the second and third sentences of Complaint Paragraph 4, Defendants admit that the binding of PD-L1 expressed on a cancer cell to PD-1 expressed on an activated T cell may suppress the proliferation of that T cell and other aspects of the immune system's response to the cancer cell.  Except as specifically admitted, Defendants deny the allegations in Complaint Paragraph 4.

5.      Defendants admit that the '899 patent claims methods of treating cancer, decreasing tumor growth, and/or suppressing metastatic tumor cells comprising administering to a human patient an effective amount of an anti-PD-L1 monoclonal antibody that inhibits an interaction between PD-1 and PD-L1, but deny that these methods are the inventions of the named inventors of the '899 patent.  Defendants specifically deny the allegations in the second sentence of Complaint Paragraph 5, as the '899 patent does not contain any data from a clinical trial in human beings suffering from cancer.  With respect to the allegations in the third sentence of Complaint Paragraph 5, Defendants state that, after receiving a substance called 292 from

Gordon J. Freeman, Ph.D. at the Dana-Farber Cancer Institute, Inc., Clive R. Wood, Ph.D. and

his colleagues at the Genetics Institute, Inc. – now a part of Pfizer – discovered the interaction

between 292 and PD-1 and through various experiments determined the effects of this interaction

on activated T cells and other aspects of the immune response.  Defendants further admit that

292 was later renamed PD-L1 and that Drs. Wood and Freeman determined that anti-PD-L1

antibodies, as well as anti-PD-1 antibodies, could be used to block the interaction between PD-

L1 and PD-1 and thereby prevent the effect of that interaction in cancer patients:  the

downregulation of T cell proliferation and other aspects of the immune system's response to

cancer cells.  Except as specifically admitted, Defendants deny the allegations in Complaint

Paragraph 5.

       6.     Defendants deny that Plaintiffs, by themselves, invented anti-PD-1 antibodies or,

by themselves, created a scientific breakthrough.  Defendants admit that OPDIVO® (nivolumab)

is an anti-PD-1 antibody according to its FDA-approved prescribing information, and thus is

expressly not covered by the '899 patent.  Defendants admit that the approved indications for

OPDIVO® (nivolumab) in the United States are identified in its FDA-approved prescribing

information, but deny that OPDIVO® (nivolumab) is approved for all types of cancer treatment

or all types of lung cancer treatment.  For example, as BMS reported in an August 5, 2016 press

release, "a trial investigating the use of *Opdivo* (nivolumab) as monotherapy, did not meet its

primary endpoint of progression-free survival in patients with previously untreated advanced

non-small cell lung cancer (NSCLC) whose tumors expressed PD-L1 at ≥ 5%."

(https://news.bms.com/press-release/bristolmyers/bristol-myers-squibb-announces-top-line-

results-checkmate-026-phase-3-stu, last accessed October 4, 2017.)  Defendants lack knowledge

or information sufficient to form a belief as to the truth of the allegations regarding the order of

approvals for anti-PD-1 antibodies, and deny them on that basis.  Except as specifically admitted, Defendants deny the allegations in Complaint Paragraph 6.

7.      Defendants admit that OPDIVO® (nivolumab) has been approved by the FDA for certain indications and that, according to its FDA-approved prescribing information, OPDIVO® (nivolumab) is a PD-1 blocking antibody "that binds to the PD-1 receptor and blocks its interaction with PD-L1 and PD-L2," and that OPDIVO® (nivolumab) is expressly not covered by the '899 patent.  Except as specifically admitted, Defendants deny the allegations in Complaint Paragraph 7.

8.      Defendants deny the allegations in the first sentence of Complaint Paragraph 8. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Complaint Paragraph 8, and deny them on that basis.

9.      Defendants deny the allegations in the last sentence of Complaint Paragraph 9, and specifically deny that Plaintiffs, by themselves, developed any cancer treatments or, by themselves, helped any patients suffering from cancer.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Complaint Paragraph 9, and deny them on that basis.

10.     Defendants have an ownership interest in and/or license to the '899 patent and multiple other patents purportedly owned by Plaintiffs, and on that basis deny that they are competitors to Plaintiffs in connection with any of those patents.  Defendants lack knowledge or information sufficient to form a belief as to the truth of any other allegations in Complaint Paragraph 10, and deny them on that basis.

11.     Defendants admit that BAVENCIO® (avelumab) is an anti-PD-L1 antibody that has been approved by the FDA to treat certain cancers.  Except as specifically admitted, Defendants deny the allegations in Complaint Paragraph 11.

12.     Upon information and belief, Defendants admit the allegations in Complaint Paragraph 12.

13.     Defendants admit the allegations in Complaint Paragraph 13.

14.     Defendants admit the allegations in Complaint Paragraph 14.

15.     Defendants admit the allegations in Complaint Paragraph 15.

16.     Defendants are engaged in the research, discovery, development, manufacture, and/or sale of pharmaceutical and consumer healthcare products, including biologic products, which upon receiving FDA approval are sold throughout the United States.  Except as specifically admitted, Defendants deny the allegations in Complaint Paragraph 16.

17.     Defendants admit that the Complaint purports to bring an action for patent infringement under the patent laws of the United States, but deny that there is any factual or legal basis for any such action.  Except as specifically admitted, Defendants deny the allegations in Complaint Paragraph 17.

18.     Defendants admit that the Court has subject matter jurisdiction over claims for patent infringement, but deny that Plaintiffs have standing to pursue such a claim in connection with the '899 patent.  Defendants further deny that there is any factual or legal basis for any of Plaintiffs' claims in this action.  Except as specifically admitted, Defendants deny the allegations in Complaint Paragraph 18.

19.     EMD admits that it is a Delaware corporation subject to personal jurisdiction in this judicial district.  Except as specifically admitted, Defendants deny the allegations in Complaint Paragraph 19.

20.     Merck does not contest personal jurisdiction in this judicial district solely for purposes of this action.  Except as specifically admitted, Defendants deny the allegations in Complaint Paragraph 20.

21.     Merck does not contest personal jurisdiction in this judicial district solely for purposes of this action.  Except as specifically admitted, Defendants deny the allegations in Complaint Paragraph 21.

22.     Pfizer admits that it is a Delaware corporation subject to personal jurisdiction in this judicial district.  Except as specifically admitted, Defendants deny the allegations in Complaint Paragraph 22.

23.     Defendants admit that Merck and Pfizer jointly developed the anti-PD-L1 antibody, avelumab.  Defendants further admit that EMD and Pfizer market BAVENCIO® (avelumab) in the United States.  Except as specifically admitted, Defendants deny the allegations in Complaint Paragraph 23.

24.     Defendants admit that EMD and Pfizer market BAVENCIO® (avelumab) in the United States.  Defendants further admit that EMD is a U.S. subsidiary of Merck.  Except as specifically admitted, Defendants deny the allegations in Complaint Paragraph 24.

25.     Defendants admit that Merck is the owner of the "BAVENCIO" trademark in the United States.  Except as specifically admitted, Defendants deny the allegations in Complaint Paragraph 25.

26.     Merck does not contest personal jurisdiction in this judicial district solely for purposes of this action.  Except as specifically admitted, Defendants deny the allegations in Complaint Paragraph 26.

27.     Complaint Paragraph 27 states legal conclusions to which no response is required. To the extent a response is required, Defendants do not contest venue in this judicial district solely for purposes of this action.  Except as specifically admitted, Defendants deny the allegations in Complaint Paragraph 27.

28.     Defendants admit that the face of the '899 patent indicates that it issued on August 2, 2016 and that it is titled "Immunopotentiative Composition."  Defendants further admit that a purported copy of the '899 patent was attached to the Complaint.  Defendants admit that Tasuku Honjo and Ono are currently listed as assignees on the face of the '899 patent, but deny that these are the only assignees of the '899 patent given, *inter alia*, the significant contributions of Drs. Wood and Freeman to the conception of subject matter claimed in the '899 patent.  Defendants admit that Tasuku Honjo, Nagahiro Minato, Yoshiko Iwai, and Shiro Shibayama are currently listed as named inventors on the face of the '899 patent, but deny that these individuals are the only inventors of the '899 patent given, *inter alia*, the significant contributions of Drs. Wood and Freeman to the conception of subject matter claimed in the '899 patent.  Defendants deny that the '899 patent was duly and legally issued.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Complaint Paragraph 28, and deny them on that basis.

29.     Defendants admit that the '899 patent states on its face that it issued as a division of U.S. Application No. 12/959,307 (now U.S. Patent No. 8,728,474), filed on December 2, 2010, which is a division of U.S. Application No. 12/538,698 (now U.S. Patent No. 8,168,179),

filed on August 10, 2009, which is a division of U.S. Application No. 10/519,925 (now U.S. Patent No. 7,595,048), filed on January 3, 2005, which is a National Stage Entry of PCT/JP03/08420, filed on July 2, 2003.  Defendants further admit that PCT/JP03/08420 states on its face that it claims priority to Japanese Patent Application No. 2002-193391, filed on July 3, 2002, and Japanese Patent Application No. 2003-029846, filed on February 6, 2003. Defendants, however, lack knowledge or information sufficient to form a belief as to the truth of any of these continuation and/or priority statements, and deny them on that basis.  Except as specifically admitted, Defendants deny the allegations in Complaint Paragraph 29.

30.     Complaint Paragraph 30 states legal conclusions regarding claim construction issues to which no response is required.  To the extent a response is required, Defendants admit that Claim 1 of the '899 patent is accurately retyped in Complaint Paragraph 30.  Except as specifically admitted, Defendants deny the allegations in Complaint Paragraph 30.

31.     Defendants admit that EMD holds Biologics License Application ("BLA") Nos. 761049 and 761078 for BAVENCIO® (avelumab).  Defendants further admit that, as set forth in its FDA-approved prescribing information, BAVENCIO® (avelumab) is an anti-PD-L1 antibody that is FDA-approved for the treatment of:  (1) adults and pediatric patients 12 years and older with metastatic Merkel cell carcinoma; and (2) patients with locally advanced or metastatic urothelial carcinoma (UC) who have disease progression during or following platinum-containing chemotherapy, or have disease progression within 12 months of neoadjuvant or adjuvant treatment with platinum-containing chemotherapy.  Defendants further admit that EMD and Pfizer market BAVENCIO® (avelumab) in the United States and that EMD is a U.S. subsidiary of Merck.  Except as specifically admitted, Defendants deny the allegations in Complaint Paragraph 31.

32.     Defendants admit that, on March 23, 2017, the FDA approved BAVENCIO®
(avelumab) for the treatment of adults and pediatric patients 12 years and older with metastatic
Merkel cell carcinoma.  Defendants further admit that, on May 9, 2017, the FDA approved
BAVENCIO® (avelumab) for the treatment of patients with locally advanced or metastatic
urothelial carcinoma who have disease progression during or following platinum-containing
chemotherapy, or who have disease progression within 12 months of neoadjuvant or adjuvant
treatment with platinum-containing chemotherapy.  Except as specifically admitted, Defendants
deny the allegations in Complaint Paragraph 32.

33.     Defendants admit that, as set forth in the FDA-approved prescribing information
for BAVENCIO®, the recommended dose of avelumab is "10 mg/kg administered as an
intravenous infusion over 60 minutes every 2 weeks until disease progression or unacceptable
toxicity."  Except as specifically admitted, Defendants deny the allegations in Complaint
Paragraph 33.

34.     Defendants admit that the active ingredient in BAVENCIO® is avelumab.
Defendants further admit that the FDA-approved prescribing information for BAVENCIO®
(avelumab) states that avelumab is a "PD-L1 blocking antibody" and that "[a]velumab is a
human IgG1 lambda monoclonal antibody."  Defendants further admit that the prescribing
information for BAVENCIO® (avelumab) speaks for itself.  Except as specifically admitted,
Defendants deny the allegations in Complaint Paragraph 34.

35.     Defendants admit that EMD and Pfizer market BAVENCIO® (avelumab) in the
United States to be prescribed and used in accordance with its FDA-approved prescribing
information.  Except as specifically admitted, Defendants deny the allegations in Complaint
Paragraph 35.

36.     Defendants admit that EMD and Pfizer market BAVENCIO® (avelumab) in the United States to be prescribed and used in accordance with its FDA-approved prescribing information.  Defendants further admit that, as set forth in its FDA-approved prescribing information, BAVENCIO® (avelumab) is an anti-PD-L1 antibody that is FDA-approved for the treatment of:  (1) adults and pediatric patients 12 years and older with metastatic Merkel cell carcinoma; and (2) patients with locally advanced or metastatic urothelial carcinoma (UC) who have disease progression during or following platinum-containing chemotherapy, or have disease progression within 12 months of neoadjuvant or adjuvant treatment with platinum-containing chemotherapy.  Except as specifically admitted, Defendants deny the allegations in Complaint Paragraph 36.

37.     Defendants admit that EMD and Pfizer market BAVENCIO® (avelumab) in the United States to be prescribed and used in accordance with its FDA-approved prescribing information.  Except as specifically admitted, Defendants deny the allegations in Complaint Paragraph 37.

38.     Defendants admit that the FDA-approved prescribing information for BAVENCIO® (avelumab) states that "[a]velumab is a human IgG1 lambda monoclonal antibody."  Except as specifically admitted, Defendants deny the allegations in Complaint Paragraph 38.

39.     Defendants admit that, as set forth in its FDA-approved prescribing information, BAVENCIO® (avelumab) is FDA-approved for the treatment of:  (1) adults and pediatric patients 12 years and older with metastatic Merkel cell carcinoma; and (2) patients with locally advanced or metastatic urothelial carcinoma (UC) who have disease progression during or following platinum-containing chemotherapy, or have disease progression within 12 months of

neoadjuvant or adjuvant treatment with platinum-containing chemotherapy.  Except as specifically admitted, Defendants deny the allegations in Complaint Paragraph 39.

40.     Defendants admit that EMD and Pfizer market BAVENCIO® (avelumab) in the United States to be prescribed and used in accordance with its FDA-approved prescribing information, which prescribing information contains information regarding pre-clinical and clinical study results for avelumab.  Except as specifically admitted, Defendants deny the allegations in Complaint Paragraph 40.

41.     Defendants admit that EMD and Pfizer market BAVENCIO® (avelumab) in the United States to be prescribed and used in accordance with its FDA-approved prescribing information, which prescribing information contains information regarding pre-clinical and clinical study results for avelumab.  Except as specifically admitted, Defendants deny the allegations in Complaint Paragraph 41.

42.     Defendants admit that, as set forth in its FDA-approved prescribing information, BAVENCIO® (avelumab) is FDA-approved for the treatment of:  (1) adults and pediatric patients 12 years and older with metastatic Merkel cell carcinoma; and (2) patients with locally advanced or metastatic urothelial carcinoma (UC) who have disease progression during or following platinum-containing chemotherapy, or have disease progression within 12 months of neoadjuvant or adjuvant treatment with platinum-containing chemotherapy.  Except as specifically admitted, Defendants deny the allegations in Complaint Paragraph 42.

43.     Defendants admit that the FDA-approved prescribing information for BAVENCIO® (avelumab) states that:  "The recommended dose of BAVENCIO is 10 mg/kg administered as an intravenous infusion over 60 minutes every 2 weeks until disease progression

or unacceptable toxicity."  Except as specifically admitted, Defendants deny the allegations in Complaint Paragraph 43.

44.     Defendants admit that the FDA-approved prescribing information for BAVENCIO® (avelumab) states that "[a]velumab is a human IgG1 lambda monoclonal antibody."  Except as specifically admitted, Defendants deny the allegations in Complaint Paragraph 44.

45.     Defendants deny the allegations in Complaint Paragraph 45.

46.     Defendants admit the allegations in Complaint Paragraph 46.

47.     Defendants admit that Merck Patent GmbH is a subsidiary of Merck.  Except as specifically admitted, Defendants deny the allegations in Complaint Paragraph 47.

48.     Defendants admit that WO 2013/079174 is titled "Anti-PD-L1 Antibodies and Uses Thereof" and that Merck Patent GmbH is listed as the applicant.  Except as specifically admitted, Defendants deny the allegations in Complaint Paragraph 48.

49.     Defendants admit that WO 2013/079174 speaks for itself.  Except as specifically admitted, Defendants deny the allegations in Complaint Paragraph 49.

50.     Defendants admit that WO 2016/137985 is titled "PD-1/PD-L1 Inhibitors for the Treatment of Cancer" and that Merck Patent GmbH and Pfizer Inc. are listed as the applicants. Defendants further admit that WO 2016/137985 speaks for itself.  Except as specifically admitted, Defendants deny the allegations in Complaint Paragraph 50.

51.     Defendants admit that WO 2016/137985 speaks for itself.  Except as specifically admitted, Defendants deny the allegations in Complaint Paragraph 51.

52.     Defendants deny the allegations in Complaint Paragraph 52.

53.     Defendants admit that EP1537878 A1 is cited as an "X" category document in an International Search Report issued on June 6, 2013 with respect to WO 2013/079174, but deny that this document prevented the issuance of one or more patents to Merck Patent GmbH and/or Pfizer Inc., including U.S. Patent No. 9,624,298.  Defendants admit that the face of EP1537878 A1 states that PCT/JP03/08420 is its international application number, but deny the accuracy of that statement and deny that PCT/JP03/08420 or any other document allegedly filed by one or more of the Plaintiffs is the first disclosure of a method of treating tumors with anti-PD-L1 antibodies given, *inter alia*, U.S. Patent No. 7,101,550.  Except as specifically admitted, Defendants deny the allegations in Complaint Paragraph 53.

54.     Defendants deny the allegations in Complaint Paragraph 54.

55.     Defendants incorporate herein by reference their responses to the allegations in Complaint Paragraphs 1-54 as though fully set forth herein.

56.     Defendants admit that EMD and Pfizer market BAVENCIO® (avelumab) in the United States to be prescribed and used in accordance with its FDA-approved prescribing information.  Except as specifically admitted, Defendants deny the allegations in Complaint Paragraph 56.

57.     Defendants deny the allegations in Complaint Paragraph 57.

58.     Defendants deny the allegations in Complaint Paragraph 58.

59.     Defendants deny the allegations in Complaint Paragraph 59.

In response to Plaintiffs' Prayer for Relief, Defendants deny that Plaintiffs are entitled to any relief whatsoever, whether as prayed for in their Complaint or otherwise.

**GENERAL DENIAL**

Defendants deny each and every allegation contained in Plaintiffs' Complaint that was not specifically admitted in Paragraphs 1 through 59 of their Answer.

**AFFIRMATIVE DEFENSES**

Defendants allege and assert the following affirmative defenses in further response to the allegations of the Complaint, undertaking the burden of proof only as to those defenses deemed affirmative defenses by law, regardless of how such defenses are denominated herein.  In addition to the affirmative defenses asserted below, Defendants reserve the right to assert additional defenses, affirmative or otherwise, that become known in the course of this action.

**First Affirmative Defense**
**(Ownership And/Or License Pursuant To Correction Of Inventorship)**

Clive R. Wood, Ph.D. and Gordon J. Freeman, Ph.D. made, at a minimum, substantial contributions to the conception of subject matter claimed by the '899 patent.  Accordingly, the inventorship of the '899 patent should be corrected under 35 U.S.C. § 256 to add Dr. Wood and Dr. Freeman as named inventors.  Dr. Wood assigned all of his rights and interests in the subject matter claimed by the '899 patent to Genetics Institute, Inc. and its successors and assigns, which rights and interests are now all owned by Pfizer as successor and assignee.  Pfizer is properly a joint owner of the '899 patent under 35 U.S.C. § 262 – with full rights to practice and license the '899 patent without the consent of, and without accounting to, any of the Plaintiffs – and has wrongfully been denied its rights as a joint owner by the omission of Dr. Wood as a named inventor.

**Second Affirmative Defense**
**(License Pursuant To Contractual Agreements)**

Defendants have a license to practice the '899 patent pursuant to written agreements between Genetics Institute, Inc. and/or Wyeth (both now part of Pfizer), Ono, and Honjo,

including the Research and Development Collaboration Agreement dated September 6, 1994, as later amended.

### Third Affirmative Defense
### (Non-Infringement)

Defendants have not infringed, directly or indirectly, and are not infringing, directly or indirectly, any claim of the '899 patent, either literally or under the doctrine of equivalents.

### Fourth Affirmative Defense
### (Non-Infringement Under 35 U.S.C. § 271(e)(1))

Prior to the March 23, 2017 FDA approval of BAVENCIO® (avelumab) to treat metastatic Merkel cell carcinoma, Defendants' activities in the United States in connection with BAVENCIO® (avelumab) were all reasonably related to the "development and submission of information under a Federal law which regulates the manufacture, use, or sale of drugs or veterinary biological products."  Under 35 U.S.C. § 271(e)(1), none of Defendants' activities prior to March 23, 2017 could have constituted infringement of any claim of the '899 patent. Since March 23, 2017, Defendants have engaged in additional activities in the United States in connection with BAVENCIO® (avelumab) that are reasonably related to the "development and submission of information under a Federal law which regulates the manufacture, use, or sale of drugs or veterinary biological products."  Under 35 U.S.C. § 271(e)(1), no such activities can constitute infringement of any claim of the '899 patent.

### Fifth Affirmative Defense
### (Invalidity Under Part II Of Title 35)

One or more of the asserted claims of the '899 patent are invalid for failure to comply with one or more of the requirements of Part II of Title 35, including but not limited to 35 U.S.C. §§ 101, 102, and/or 103.

**Sixth Affirmative Defense**
**(Invalidity Under Section 112 Of Title 35)**

One or more of the asserted claims of the '899 patent are invalid for failure to comply

with one or more of the requirements of 35 U.S.C. § 112.

**Seventh Affirmative Defense**
**(Patent Misuse)**

One or more of the asserted claims of the '899 patent are unenforceable under the

doctrine of patent misuse.  The '899 patent would not exist but for the inventive contributions of

Clive R. Wood, Ph.D. during his time at Genetics Institute, Inc. and its successors (now part of

Pfizer).  In seeking to enforce the '899 patent against Defendants, Plaintiffs are improperly

seeking to extend the physical or temporal scope of the '899 patent to cover the activities of

entities having, at a minimum, a joint ownership interest in, and/or license to, the '899 patent.

**Eighth Affirmative Defense**
**(No Willful Infringement)**

Should any of the Defendants be found to infringe any claim of the '899 patent, no such

infringement was willful.

**Ninth Affirmative Defense**
**(Failure To State A Claim)**

The Complaint fails to state a claim upon which relief can be granted.

**Tenth Affirmative Defense**
**(Lack Of Standing)**

Plaintiffs lack standing to assert the '899 patent in this action because, *inter alia*, they do

not own all rights to that patent.

**Eleventh Affirmative Defense**
**(Statutory Bar Concerning Uses By The United States)**

Plaintiffs' claims for relief are limited by the provisions of 28 U.S.C. § 1498.

### Twelfth Affirmative Defense
**(No Costs)**

Plaintiffs are not entitled to seek recovery of their costs pursuant to 35 U.S.C. § 288.

## COUNTERCLAIMS

Pfizer Inc., Wyeth LLC, Genetics Institute, LLC (Pfizer Inc., Wyeth LLC, and Genetics, Institute, LLC collectively referred to in these counterclaims as "Pfizer"), EMD Serono, Inc. ("EMD"), and Merck KGaA ("Merck") (Pfizer, EMD, and Merck collectively referred to in these counterclaims as "Counterclaim Plaintiffs") hereby assert counterclaims against Bristol-Myers Squibb Co. ("BMS"), E. R. Squibb & Sons L.L.C. ("Squibb"), Ono Pharmaceutical Co., Ltd. ("Ono"), and Tasuku Honjo ("Honjo") (collectively referred to in these counterclaims as "Counterclaim Defendants") as follows.

### Introduction

1.     This case concerns a pioneering development in the treatment of cancer, in particular, a new means to treat cancer using a technique called "cancer immunotherapy." Cancer immunotherapy is a way to boost the ability of the body's own disease-fighting cells – the immune system's T lymphocytes, or "T cells" – to proliferate and make a sustained attack on cancer cells.  T cells are a critical component of the body's immune system, recognizing and protecting against viruses and other foreign invaders and also helping to destroy cancer cells.

2.     The critical research that made cancer immunotherapy possible took place in the late 1990s and early 2000s at Dana-Farber Cancer Institute, Inc. ("Dana-Farber") and Genetics Institute, Inc. ("Genetics Institute"), a Cambridge, Massachusetts biotechnology company.  This research was led by Dana-Farber scientist Gordon J. Freeman, Ph.D. and Genetics Institute scientist Clive R. Wood, Ph.D.  Freeman is a researcher in the Department of Medical Oncology at Dana-Farber and Professor of Medicine at Harvard Medical School.  Wood is a former

researcher and Director of Molecular Immunology at Genetics Institute.  In the course of their research at Dana-Farber and Genetics Institute, Freeman and Wood discovered that a particular protein carried on the surface of certain human cells helps the cells to avoid being attacked by the immune system's T cells.  This protein, called PD-L1, does so by interacting with a complementary protein on the surface of activated T cells called PD-1 ("PD" is an acronym for "programmed death").  When the PD-L1 on a normal cell binds to PD-1 on an activated T cell, the effect is to inhibit (or "downregulate") the proliferation of T cells, as well as the T cells' expression of certain immune proteins called cytokines.  In this way, the PD-1/PD-L1 interaction prevents an individual's T cells from launching an immune response against his or her own normal cells, and in doing so provides a critical checkpoint against autoimmune disease. Because of this property, PD-1 is sometimes referred to as an "immune checkpoint protein."

3.      Although the existence of PD-1 on certain T cells was discovered earlier in the 1990s, its biological function remained unclear to scientists until Freeman and Wood identified its specific binding partner ("ligand"), initially called B7-4 or 292 and subsequently renamed PD-L1.  Only then was PD-1's function in T cell regulation, and the existence of the PD-1/PD-L1 pathway, unveiled.  Freeman and Wood later identified the existence of a second ligand for PD-1, now known as PD-L2.

4.      In addition to certain normal cells, it was discovered that certain cancer cells carry PD-L1 protein on their surfaces.  This allows the cancer cells to interact with PD-1 on activated T cells and misuse the mechanism normal cells use to suppress an immune response against them.  As a consequence, the cancer cells are able to live on and multiply while suppressing the attack by the body's T cells.

5.      Cancer immunotherapy in effect unmasks cancer cells that "disguise" themselves using PD-L1, revealing those cancer cells for what they are and enabling the immune system to do its job.  This technique uses therapeutic antibodies to block either PD-L1 on cancer cells or PD-1 on activated T cells so that their interaction is disrupted and the immune checkpoint is no longer available for misuse by the cancer cells.

6.      The PD-1/PD-L1 pathway can be analogized to a biological lock and key.  When PD-L1 is expressed on a normal cell and finds PD-1 on an activated T cell, it "unlocks" the immune checkpoint, preventing an overactive immune response such as occurs in autoimmune disease.  To treat cancer, the goal is the opposite:  to prevent PD-L1 on cancer cells from binding to PD-1 on activated T cells, thus encouraging a more powerful immune response against the cancer cells.  This can be done using antibodies to block either PD-L1 or PD-1.  By this innovative new technique, the command that once prevented or weakened the immune system's attack on cancer is lifted, and the body's own natural defenses are allowed to fight the disease.

7.      United States Patent No. 7,595,048 ("the '048 patent"); United States Patent No. 8,168,179 ("the '179 patent"); United States Patent No. 8,728,474 ("the '474 patent"); United States Patent No. 9,067,999 ("the '999 patent"); United States Patent No. 9,073,994 ("the '994 patent"); and United States Patent No. 9,402,899 ("the '899 patent") (collectively, the "Disputed Patents") issued between 2009 and 2016.  The Disputed Patents wrongly claim that the idea of blocking the PD-1/PD-L1 pathway as a means to allow T cells to attack cancer cells was the sole invention of Honjo, Iwai, Minato, and Shibayama.  In fact, as described below, the Disputed Patents resulted from a collegial and highly successful research collaboration among scientists at several institutions.  The collaboration included not only Honjo at Kyoto University, but also Freeman at Dana-Farber and Wood at Genetics Institute.  The three of them worked together to

reveal the mysteries of the PD-1/PD-L1 interaction and the blockade of that interaction using monoclonal antibodies.  Through correspondence and face-to-face meetings that took place at Genetics Institute's offices in Cambridge and elsewhere, they shared their knowledge, their ideas, their experimental data, and their drafts of scientific publications to arrive at the conception of the inventions claimed in the Disputed Patents.  At a minimum, Freeman and Wood made significant contributions to the conception of subject matter claimed in the Disputed Patents, and both are joint inventors of subject matter claimed in each of the Disputed Patents.

8.     Once their discoveries were shared with the scientific community, other pharmaceutical companies began clinical testing of antibodies against PD-1 and PD-L1.  In 2014, the United States Food and Drug Administration ("FDA") approved two antibodies against PD-1, OPDIVO®, developed by BMS and Squibb, and KEYTRUDA®, developed by Merck & Co., Inc., for treatment of advanced melanoma.  In 2016, the FDA approved an antibody against PD-L1, TECENTRIQ®, developed by Genentech, for the treatment of urothelial carcinoma.

9.     In the field of cancer immunotherapy, Pfizer, Merck, and EMD have worked together to research and develop an antibody against PD-L1, called avelumab, which is sold under the brand name BAVENCIO®.  To date, BAVENCIO® has obtained FDA approval for the treatment of metastatic Merkel cell carcinoma (the first and only treatment approved for this indication) and urothelial carcinoma.  Clinical studies of BAVENCIO® are ongoing for additional indications, including non-small cell lung cancer, gastric cancer, ovarian cancer, and renal cell carcinoma.

## The Parties

10.     EMD Serono, Inc. is a Delaware corporation having a principal place of business at One Technology Place, Rockland, Massachusetts 02370.  EMD Serono, Inc. is a U.S. subsidiary of Merck KGaA and the biopharmaceutical division of Merck KGaA.

11.     Merck KGaA is a German corporation having a principal place of business at Frankfurter Str. 250, 64293 Darmstadt, Hessen, Germany.

12.     Pfizer Inc. is a Delaware corporation having a principal place of business at 235 East 42nd Street, New York, New York 10017.

13.     Wyeth LLC is a Delaware limited liability company having a principal place of business at 235 East 42nd Street, New York, New York 10017.  Wyeth LLC is a wholly owned subsidiary of Pfizer Inc.

14.     Genetics Institute, LLC is a Delaware limited liability company having a principal place of business at 235 East 42nd Street, New York, New York 10017.  Genetics Institute, LLC is a wholly owned subsidiary of Wyeth LLC.

15.     Upon information and belief, BMS is a Delaware corporation having a principal place of business at 345 Park Avenue, New York, New York 10154.

16.     Upon information and belief, Squibb is Delaware limited liability company having a principal place of business at Route 206 & Province Line Road, Princeton, New Jersey 08543.

17.     Upon information and belief, Ono is a Japanese corporation having a place of business at 8-2 Kyutaromachi 1-chome, Chuo-ku, Osaka 541-8654, Japan.

18.     Upon information and belief, Tasuku Honjo is an individual having a place of business at Kyoto University, Graduate School of Medicine, Yoshida, Sakyo-ku, Kyoto 606-8501, Japan.

## Jurisdiction And Venue

19.     This Court has subject matter jurisdiction over these counterclaims pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202 and 35 U.S.C. § 256.

20.     This Court has personal jurisdiction over BMS because, *inter alia*, BMS is a Delaware corporation.

21.     This Court has personal jurisdiction over Squibb because, *inter alia*, Squibb is a Delaware limited liability company.

22.     This Court has personal jurisdiction over Ono because, *inter alia*, Ono purposefully availed itself of the benefits and laws of this judicial district, including by filing the instant action in this judicial district.

23.     This Court has personal jurisdiction over Honjo because, *inter alia*, Honjo purposefully availed himself of the benefits and laws of this judicial district, including by filing the instant action in this judicial district.

24.     Venue is proper under 28 U.S.C. §§ 1391(b) and (c).

25.     An actual case or controversy exists between Counterclaim Plaintiffs and Counterclaim Defendants regarding the invalidity of the '899 patent within the meaning of the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*.  This is a substantial controversy between parties having adverse legal interests regarding the invalidity of the '899 patent of sufficient immediacy and reality to warrant the issuance of declaratory judgment relief of the type sought by Counterclaim Plaintiffs' counterclaims.

26.     An actual case or controversy also exists between Counterclaim Plaintiffs and Counterclaim Defendants regarding the need to correct inventorship of the Disputed Patents under 35 U.S.C. § 256.

### The Freeman/Wood/Honjo Collaboration

27.     In the 1990s, Freeman was investigating the "B7" family of proteins.  Two of the proteins in this family, called B7-1 and B7-2, were known to be ligands critical to the regulation of the immune response.  Early in an immune response, B7-1 and B7-2 bind to a receptor on the surface of T cells referred to as CD28, which produces a "co-stimulatory" signal that contributes to the activation of T cells, causing their proliferation and enhancing an immune response.  Later in an immune response, the activated T cells begin expressing a second receptor, called CTLA-4, that is also able to bind to B7-1 and B7-2.  However, whereas the binding of CD28 by B7-1 and B7-2 enhances the immune response, the binding of the B7 ligands to CTLA-4 has the opposite effect, producing an inhibitory signal that keeps the immune response in check and reduces the damage the immune response causes to healthy tissue.

28.     Through this work, Freeman came to believe that there would be additional B7-like and CD28-like receptor/ligand pairs, not yet discovered, that would play a similar role in T cell activation.  One such receptor he discovered was a receptor on mouse T cells called ICOS.  Freeman's work on ICOS was conducted through a research collaboration with scientists at Genetics Institute in Cambridge, Massachusetts, including Wood.  This work led to the identification at Genetics Institute of a human B7-like molecule that was a ligand for human ICOS.

29.     Through further investigation of B7-like proteins, Freeman discovered a novel protein he called "B7-4" or "292."  After experimentation in his lab at Dana-Farber, Freeman isolated the full-length complementary DNA ("cDNA") that encodes the 292 protein.

30.     On August 23, 1999, Freeman and his colleagues at Dana-Farber filed a provisional patent application, Provisional Patent Application No. 60/150,390, describing their discovery of 292 as a newly identified B7-like protein.

31.     Shortly after filing the provisional application, Freeman transferred the cDNA for 292 to Genetics Institute for further study.  Later, in 2000, this protein was renamed "PD-L1," and for convenience, it is referred to herein as PD-L1.

32.     In the meantime, Wood had been conducting studies on the PD-1 protein, including investigations to identify molecules that would interact with PD-1, in order to better understand its function.  PD-1 had been known since the early 1990s, but its ligand(s), biological function, and mechanism of action were not known.

33.     Wood's work was done in furtherance of a longstanding collaboration among Genetics Institute, Ono, and Honjo that included research on PD-1, a search for the identity of its ligand, and an investigation into the activity and function of PD-1.  To facilitate Wood's investigations, Honjo provided Wood with the cDNA that encoded PD-1.  On information and belief, Honjo's research in furtherance of this collaboration was supported by Ono and Genetics Institute.

34.     In the course of his research on PD-1, Wood investigated the homology between PD-1 and CTLA-4, and hypothesized that the missing ligand for PD-1 could be a B7-like protein.  Wood's experiments indicated that Freeman's PD-L1 molecule (one of the B7 family of proteins) bound to PD-1, confirming Wood's hypothesis.  In other words, PD-L1 was the missing

ligand for PD-1.  Subsequent experiments by Wood and Freeman indicated that the interaction of PD-1 with PD-L1 has an inhibitory effect on the immune response.

35.      On November 10, 1999, Freeman and Wood filed a second provisional patent application, Provisional Patent Application No. 60/164,897, describing their discovery that PD-1 is a receptor for PD-L1 and that the interaction between PD-1 and PD-L1 results in modulation of the immune response.

36.      After identifying PD-L1 as the ligand of PD-1, Wood facilitated an introduction of Freeman to Honjo and arranged a meeting among Dana-Farber, Genetics Institute, Honjo, and Ono at Genetics Institute's offices in Cambridge.

37.      The meeting took place on October 25, 1999 as one in a series of regularly held collaboration meetings between Genetics Institute and Ono.  At the meeting, Freeman, Wood, and Honjo freely shared their research and agreed to collaborate with respect to the PD-1/PD-L1 pathway.  The work of Freeman and Wood demonstrating binding of PD-L1 to PD-1 had not yet been made public.  Honjo learned of this discovery for the first time from his interactions with Wood and Freeman.  Ono scientist Shibayama also attended and participated in the October 25, 1999 meeting in Cambridge.

38.      At the meeting, Freeman and Wood discussed additional, then-unpublished experimental data.  Freeman shared with Honjo and the other meeting participants, among other things, the cDNA sequence encoding PD-L1, a sequence comparison between PD-L1 and other members of the B7 family of proteins, and data showing the expression of PD-L1 on various types of cells.  Wood shared with Honjo and the other meeting participants PD-1 fusion protein binding data, data from the interaction of anti-PD-1 antibodies on the binding of PD-1 and PD-

L1, and data from T cell proliferation and activation assays showing that PD-L1-expressing cells inhibit T cell proliferation and IL-2 cytokine expression.

39.     Freeman also shared with Honjo and the other meeting participants that cDNA partially encoding PD-L1 (expressed sequence tags, or "EST"), which Freeman had identified in a genetic database and had used to isolate the full-length sequence of PD-L1, had come from a human ovarian tumor, meaning PD-L1 was expressed by at least some human tumors.

40.     At the meeting, although Honjo's presentation concerned possible ways to engage PD-1 to treat autoimmune disease by downregulating the immune response, Freeman raised the possibility of blocking the PD-1/PD-L1 pathway in order to enhance, or upregulate, the immune response to cancer.

41.     Immediately following the meeting, Freeman and Honjo agreed that Freeman would send Honjo the cDNA for PD-L1 and cells engineered to produce PD-L1 protein.  They agreed that Honjo, in turn, would permit Wood to send to Freeman the PD-1 antibodies made by Honjo (which Honjo had previously sent to Wood) and the PD-1-immunoglobulin fusion protein made by Wood using Honjo's PD-1 cDNA.  Confirming this, on November 2, 1999, Honjo executed a Dana-Farber Material Transfer Agreement for the transfer to Honjo of murine and human cDNA encoding PD-L1 and related know-how.  The agreement identified the subject of Honjo's research using these materials as "collaborative research."  Freeman sent the PD-L1 materials to Honjo later that month.

42.     In the course of the collaboration, Freeman, Wood, and Honjo continued their experiments, including experiments to block the PD-1/PD-L1 pathway; shared their data; and coauthored a scientific paper reporting certain of their discoveries.  Beginning in December 1999, they exchanged numerous drafts of the paper, and each contributed comments and

suggestions.  The paper eventually was published as Freeman *et al.*, "Engagement of the PD-1 Immunoinhibitory Receptor by a Novel B7 Family Member Leads to Negative Regulation of Lymphocyte Activation," J. Exp. Med., October 2, 2000.

43.     The paper describes Freeman's search for B7-like molecules and Wood's search for the ligand of PD-1 and discovery of the binding of PD-L1 to PD-1.  The paper demonstrates that the PD-1/PD-L1 interaction leads to the inhibition of lymphocyte proliferation.  The paper contains five figures reporting experimental data.  Freeman contributed Figure 1, and Wood contributed Figure 5.  Freeman and Wood contributed Figures 2 and 3.  Honjo and Wood contributed Figure 4.

44.     At Freeman's suggestion, the paper reports that PD-L1 is expressed in some cancers, "rais[ing] the possibility that some tumors may use PD-L1 to inhibit an anti-tumor immune response."

45.     In 2000, further experiments were conducted and additional data shared among Freeman, Wood, and Honjo.  In particular, during 2000, Freeman and Wood investigated the expression of PD-L1 on a variety of tissues and tumor cells.

46.     On August 23, 2000, Freeman and Wood filed an international patent application, International Application No. PCT/US00/23347, claiming priority to their August 23, 1999 and November 10, 1999 provisional patent applications.

47.     At the September 8, 2000 "Honjo/Genetics Institute/Ono Scientific Meeting," Honjo, Freeman, and Wood met at Genetics Institute's offices in Cambridge to discuss their collaborative research and share their further ideas.  Ono scientist Shibayama also attended and participated in the meeting.  On information and belief, Shibayama made a presentation at that meeting on Ono's PD-1/PD-L1 pathway research.  Freeman made a presentation that included

immunohistochemistry data demonstrating PD-L1 expression on various human tumors, including lung carcinomas, invasive lobular breast carcinomas, thymomas, and T cell neoplasms. Scientists from Wood's lab presented results from Genetics Institute's continuing studies of the PD-1/PD-L1 pathway and the results of experiments on the development of anti-PD-1 and anti-PD-L1 single-chain variable fragments capable of blocking the interaction between PD-1 and PD-L1.  On information and belief, Honjo made a presentation that included discussion of a mouse tumor model that was used to show that tumors formed from transfected B16 melanoma cells expressing PD-L1 exhibited greater growth than tumors formed from B16 melanoma cells that did not express PD-L1.

48.    On October 5, 2000, Honjo executed another Material Transfer Agreement with Dana-Farber, under which Honjo would be provided with anti-human PD-L1 antibody to use in further experiments.

49.    A paper co-authored by Freeman, Wood, Honjo, and others (Latchman *et al.*, "PD-L2 is a second ligand for PD-1 and inhibits T cell activation," Nature Immunology, March 2001) reported Freeman's experimental data showing that PD-L1 is highly expressed in a number of tumor cell lines, including human breast cancer cell lines and mouse tumor cell lines of lymphohematopoietic origin, hepatoma (liver), and neuroblastoma.  These data led to the suggestion in the paper that "[b]locking the PD-1 pathway may enhance anti-tumor immunity," and that the pathway "may be an attractive therapeutic target."  Drafts of this paper were exchanged among Freeman, Wood, and Honjo prior to publication, and each contributed comments and ideas to the final paper.  Five of the six figures in the paper were contributed by Freeman based on experiments he supervised; Freeman and Wood contributed to the remaining figure.

29

50.     The collaboration between Genetics Institute, Honjo, and Ono on PD-1 continued until November 2003, when Genetics Institute and Ono mutually agreed to terminate their Research and Development Collaboration Agreement.  In terminating their agreement, Genetics Institute and Ono agreed that each party retained a royalty-free, worldwide, non-exclusive license to use any patent rights necessary to develop, manufacture, or market any "new factors" and related products – which would include monoclonal antibodies that disrupt the PD-1/PD-L1 pathway – with the right to sublicense third parties as necessary for such purpose.

51.     In 2014, Freeman and Honjo were both recipients of the Cancer Research Institute's William B. Coley Award for Distinguished Research in Tumor Immunology, its top scientific prize, for their contributions to the discovery of the PD-1 pathway.

<u>**The Disputed Patents**</u>

52.     These counterclaims involve six United States patents:  the '048 patent, the '179 patent, the '474 patent, the '999 patent, the '994 patent, and the '899 patent.  True and correct copies of these Disputed Patents are attached hereto as Exhibits A through F.

53.     Honjo, Minato, and Iwai filed Japanese Patent Application 2002-194491 on July 3, 2002 and Japanese Patent Application 2003-029846 on February 6, 2003.  On July 2, 2003, Honjo, Minato, Iwai, and Ono scientist Shibayama filed PCT Application No. PCT/JP03/08420, claiming priority to the Japanese Patent Applications.  In the Disputed Patents, which claim priority to the July 3, 2002 and February 6, 2003 Japanese Patent Applications, the applicants stated that they "found the substances that could inhibit the inhibitory signals of PD-1, PD-L1, or PD-L2 hav[e] therapeutic potential for cancer or infection and completed the present invention."

54.     On September 29, 2009, the United States Patent Office issued the '048 patent, titled "Method for Treatment of Cancer by Inhibiting the Immunosuppressive Signal Inducted by

PD-1."  The '048 patent claims priority to the July 3, 2002 and February 6, 2003 Japanese Patent Applications.  The '048 patent is currently co-assigned to Honjo and Ono.  It currently names as inventors Honjo, Minato, Iwai, and Shibayama.  Neither Freeman nor Wood is currently named as an inventor.

55.     Claim 1 of the '048 patent is representative:  "A method for treatment of cancer, wherein a pharmaceutically effective amount of completely human anti-PD-1 antibody is parenterally administered to a subject with cancer in which PD-L1 or PD-L2 is over-expressed, postoperatively."

56.     On May 1, 2012, the United States Patent Office issued the '179 patent, titled "Treatment Method Using Anti-PD-L1 Antibody."  The '179 patent also claims priority to the July 3, 2002 and February 6, 2003 Japanese Patent Applications.  The '179 patent shares a common specification with the '048 patent.  The '179 patent is currently co-assigned to Honjo and Ono.  It currently names as inventors Honjo, Minato, Iwai, and Shibayama.  Neither Freeman nor Wood is currently named as an inventor.

57.     Claim 1 of the '179 patent is representative:  "A method of treating a PD-L1-expressing tumor, comprising administering a pharmaceutically effective amount of an anti-PD-L1 antibody to a patient in need thereof, in combination with a pharmaceutically effective amount of one or more chemotherapy drugs, wherein said one or more chemotherapy drugs are selected from the group consisting of an alkylating agent, a nitrosourea agent, an antimetabolite, an antitumor antibiotic, an alkaloid derived from a plant, a topoisomerase inhibitor, a hormone therapy medicine, a hormone antagonist, an aromatase inhibitor, a P-glycoprotein inhibitor and a platinum complex derivative."

58.     On May 20, 2014, the United States Patent Office issued the '474 patent, titled "Immunopotentiative Composition."  The '474 patent also claims priority to the July 3, 2002 and February 6, 2003 Japanese Patent Applications.  The '474 patent shares a common specification with the '048 patent and the '179 patent.  The '474 patent is currently co-assigned to Honjo and Ono.  It currently names as inventors Honjo, Minato, Iwai, and Shibayama.  Neither Freeman nor Wood is currently named as an inventor.

59.     Claim 1 of the '474 patent is representative:  "A method for treatment of a tumor in a patient, comprising administering to the patient a pharmaceutically effective amount of an anti-PD-1 monoclonal antibody."

60.     On June 30, 2015, the United States Patent Office issued the '999 patent, titled "Immunopotentiative Composition."  The '999 patent also claims priority to the July 3, 2002 and February 6, 2003 Japanese Patent Applications.  The '999 patent shares a common specification with the '048 patent, the '179 patent, and the '474 patent.  The '999 patent is currently co-assigned to Honjo and Ono.  It currently names as inventors Honjo, Minato, Iwai, and Shibayama. Neither Freeman nor Wood is currently named as an inventor.

61.     Claims 1 and 19 of the '999 patent are representative.  Claim 1 recites:  "A method of treating a lung cancer comprising administering a composition comprising a human or humanized anti-PD-1 monoclonal antibody to a human with the lung cancer, wherein the administration of the composition treats the lung cancer in the human."  Claim 19 recites:  "The method of claim 1, wherein the lung cancer expresses PD-L1."

62.     On July 7, 2015, the United States Patent Office issued the '994 patent, titled "Immunopotentiative Composition."  The '994 patent also claims priority to the July 3, 2002 and February 6, 2003 Japanese Patent Applications.  The '994 patent shares a common specification

with the '048 patent, the '179 patent, the '474 patent, and the '999 patent.  The '994 patent is currently co-assigned to Honjo and Ono.  It currently names as inventors Honjo, Minato, Iwai, and Shibayama.  Neither Freeman nor Wood is currently named as an inventor.

63.  Claims 1 and 14 of the '994 patent are representative.  Claim 1 recites:  "A method of treating a metastatic melanoma comprising intravenously administering an effective amount of a composition comprising a human or humanized anti-PD-1 monoclonal antibody and a solubilizer in a solution to a human with the metastatic melanoma, wherein the administration of the composition treats the metastatic melanoma in the human."  Claim 14 recites:  "The method of claim 1, wherein the metastatic melanoma expresses PD-L1."

64.  On August 2, 2016, the United States Patent Office issued the '899 patent, titled "Immunopotentiative Composition."  The '899 patent also claims priority to the July 3, 2002 and February 6, 2003 Japanese Patent Applications.  The '899 patent shares a common specification with the '048 patent, the '179 patent, the '474 patent, the '999 patent, and the '994 patent.  The '899 patent is currently co-assigned to Honjo and Ono.  It currently names as inventors Honjo, Minato, Iwai, and Shibayama.  Neither Freeman nor Wood is currently named as an inventor.

65.  Claims 1 and 19 of the '899 patent are representative.  Claim 1 recites:  "A method of treating a tumor in a human patient in need thereof comprising administering to the human an effective amount of an anti-PD-L1 monoclonal antibody that inhibits an interaction between PD-1 and PD-L1, wherein the anti-PD-L1 monoclonal antibody treats the tumor in the patient."  Claim 19 recites:  "A method of decreasing tumor growth in a human patient in need thereof comprising administering to the human patient an effective amount of an anti-PD-L1 monoclonal antibody, wherein the anti-PD-L1 monoclonal antibody inhibits an interaction between PD-1 and PD-L1 and decreases the tumor growth in the human patient."

66.     Ono and Honjo are currently co-assignees of each of the Disputed Patents.  On information and belief, Honjo licensed some of his rights in the Disputed Patents to Ono.  On information and belief, Ono granted BMS an exclusive license to the '048 patent, the '474 patent, the '999 patent, the '994 patent, and the '899 patent.  In addition, on information and belief, Ono granted BMS a non-exclusive license to the '179 patent.  On information and belief, Squibb is an exclusive licensee of one or more rights under the Disputed Patents.

67.     The Disputed Patents report certain experiments using anti-PD-1 and anti-PD-L1 antibodies to inhibit the function of the PD-1/PD-L1 pathway and thereby suppress tumor proliferation.  On information and belief, these experiments depended on and grew out of Honjo's collaboration with Freeman and Wood, during which Freeman and Wood privately shared with Honjo, *inter alia*, their discovery of the PD-L1 and PD-L2 ligands to PD-1; their discovery of the biological function of the PD-1/PD-L1 pathway; their experimental data, including data that showed the expression of PD-L1 on various tumors; and their idea that the PD-1/PD-L1 pathway would be an attractive target for treating cancer.

68.     In their meetings and other communications with Honjo, Freeman and Wood did more than merely provide well-known principles or explain the state of the art.

69.     At a minimum, in connection with their collaborative research with Honjo, Freeman and Wood made significant contributions to the conception of subject matter claimed in each of the Disputed Patents.

70.     Freeman is a joint inventor of each of the Disputed Patents.

71.     Wood is a joint inventor of each of the Disputed Patents.

72.     Dana-Farber, as assignee, is a co-owner of each of the Disputed Patents.

73.     Pfizer, as assignee, is a co-owner of each of the Disputed Patents.

74.     In light of the fact that, at a minimum, Freeman and Wood each made significant contributions to the conception of subject matter claimed in each of the Disputed Patents, Counterclaim Plaintiffs seek an order correcting the inventorship of each of the Disputed Patents under 35 U.S.C.§ 256 to add Freeman and Wood as named inventors.  Counterclaim Plaintiffs' objective in pursuing this counterclaim is to continue to build on the groundbreaking work of Pfizer's scientists at Genetics Institute and provide therapies for some of the most difficult to treat cancers through the research and development of immunotherapies, such as BAVENCIO®.

75.     Additionally, pursuant to the terms of the Research and Development Collaboration Agreement entered into between Genetics Institute and Ono on or about September 6, 1994, as amended in March 1999, Pfizer has a perpetual, royalty-free, worldwide, non-exclusive license to the Disputed Patents, with the right to grant sublicenses to, *inter alia*, Merck and EMD.

76.     Merck and EMD have a non-exclusive license to the Disputed Patents from Pfizer.

77.     In the Complaint, Counterclaim Defendants allege that the '899 patent was duly and legally issued and that Pfizer Inc., Merck, and EMD have infringed the '899 patent.

78.     In their Answer to the Complaint, Pfizer Inc., Merck, and EMD deny that the '899 patent was duly and legally issued and deny that they have infringed the '899 patent.

<u>**Counterclaim Count I**</u>
**(Correction Of Inventorship Of United States Patent No. 7,595,048)**

79.     Counterclaim Plaintiffs repeat and incorporate by reference the allegations in Counterclaim Paragraphs 1 through 78 as though fully set forth herein.

80.     At a minimum, Freeman and Wood each made significant contributions to the conception of subject matter claimed in the '048 patent.

81.     Freeman and Wood are joint inventors of the '048 patent.

82.     The inventorship of the '048 patent should be corrected under 35 U.S.C. § 256 to add Freeman and Wood as named inventors to the patent.

## Counterclaim Count II
### (Correction Of Inventorship Of United States Patent No. 8,168,179)

83.     Counterclaim Plaintiffs repeat and incorporate by reference the allegations in Counterclaim Paragraphs 1 through 82 as though fully set forth herein.

84.     At a minimum, Freeman and Wood each made significant contributions to the conception of subject matter claimed in the '179 patent.

85.     Freeman and Wood are joint inventors of the '179 patent.

86.     The inventorship of the '179 patent should be corrected under 35 U.S.C. § 256 to add Freeman and Wood as named inventors to the patent.

## Counterclaim Count III
### (Correction Of Inventorship Of U.S. Patent No. 8,728,474)

87.     Counterclaim Plaintiffs repeat and incorporate by reference the allegations in Counterclaim Paragraphs 1 through 86 as though fully set forth herein.

88.     At a minimum, Freeman and Wood each made significant contributions to the conception of subject matter claimed in the '474 patent.

89.     Freeman and Wood are joint inventors of the '474 patent.

90.     The inventorship of the '474 patent should be corrected under 35 U.S.C. § 256 to add Freeman and Wood as named inventors to the patent.

## Counterclaim Count IV
### (Correction Of Inventorship Of United States Patent No. 9,067,999)

91.     Counterclaim Plaintiffs repeat and incorporate by reference the allegations in Counterclaim Paragraphs 1 through 90 as though fully set forth herein.

92.     At a minimum, Freeman and Wood each made significant contributions to the conception of subject matter claimed in the '999 patent.

93.     Freeman and Wood are joint inventors of the '999 patent.

94.     The inventorship of the '999 patent should be corrected under 35 U.S.C. § 256 to add Freeman and Wood as named inventors to the patent.

**Counterclaim Count V**
**(Correction Of Inventorship Of United States Patent No. 9,073,994)**

95.     Counterclaim Plaintiffs repeat and incorporate by reference the allegations in Counterclaim Paragraphs 1 through 94 as though fully set forth herein.

96.     At a minimum, Freeman and Wood each made significant contributions to the conception of subject matter claimed in the '994 patent.

97.     Freeman and Wood are joint inventors of the '994 patent.

98.     The inventorship of the '994 patent should be corrected under 35 U.S.C. § 256 to add Freeman and Wood as named inventors to the patent.

**Counterclaim Count VI**
**(Correction Of Inventorship Of United States Patent No. 9,402,899)**

99.     Counterclaim Plaintiffs repeat and incorporate by reference the allegations in Counterclaim Paragraphs 1 through 98 as though fully set forth herein.

100.     At a minimum, Freeman and Wood each made significant contributions to the conception of subject matter claimed in the '899 patent.

101.     Freeman and Wood are joint inventors of the '899 patent.

102.     The inventorship of the '899 patent should be corrected under 35 U.S.C. § 256 to add Freeman and Wood as named inventors to the patent.

103.    Since 2015, there has been a litigation pending in the District of Massachusetts seeking to correct the inventorship of the Disputed Patents to add Wood and Freeman as inventors.  As a result of the District of Massachusetts litigation and other information, each of the Counterclaim Defendants knew or should have known that the '899 patent improperly failed to name Wood and Freeman as inventors of the claimed subject matter before initiating this civil action, rendering this an exceptional case entitling Counterclaim Plaintiffs to an award of their costs and attorney fees incurred in connection with this case pursuant to 35 U.S.C. § 285.

<u>Counterclaim Count VII</u><br>
<b>(Declaratory Judgment Of Joint Ownership Of The Disputed Patents)</b>

104.    Counterclaim Plaintiffs repeat and incorporate by reference the allegations in Counterclaim Paragraphs 1 through 103 as though fully set forth herein.

105.    Wood assigned his rights in the Disputed Patents to Genetics Institute and its successors and assigns.  Pfizer, as successor and assignee, is the owner of all of Wood's rights and interests as an inventor of the inventions claimed in the Disputed Patents.

106.    Upon correction of the inventorship of the Disputed Patents under 35 U.S.C. § 256 to add Clive R. Wood as an inventor, Pfizer will be a joint owner of the Disputed Patents under 35 U.S.C. § 262 and will have the right to "make, use, offer to sell, or sell the patented invention within the United States, or import the patented invention into the United States, without the consent of and without accounting to the other owners."

107.    An actual case or controversy exists between Counterclaim Defendants and Counterclaim Plaintiffs concerning whether Pfizer is a joint owner of the Disputed Patents under 35 U.S.C. § 262.

108.    A judicial declaration of Counterclaim Plaintiffs' status as a joint owner of the Disputed Patents is necessary and appropriate to resolve this controversy.

109.    Each of the Counterclaim Defendants knew or should have known that Pfizer was a joint owner of at least the '899 patent before initiating this civil action, rendering this an exceptional case entitling Counterclaim Plaintiffs to an award of all of their attorney fees incurred in connection with this case pursuant to 35 U.S.C. § 285.

## Counterclaim Count VIII
### (Declaratory Judgment Of License To Practice The Disputed Patents)

110.    Counterclaim Plaintiffs repeat and incorporate by reference the allegations in Counterclaim Paragraphs 1 through 109 as though fully set forth herein.

111.    On or about November 24, 1993, Genetics Institute and Honjo entered into a Research Collaboration Agreement for the purpose of identifying "factors."  On or about September 6, 1994, Genetics Institute and Ono entered into a Research and Development Collaboration Agreement as part of the three-way collaboration between Genetics Institute, Honjo, and Ono.  These agreements, as amended by the parties in writing, covered the collaboration between Genetics Institute, Honjo, and Ono regarding the PD-1/PD-L1 pathway and treatments to disrupt that pathway to upregulate the immune response, including to treat cancer and including with anti-PD-1 and anti-PD-L1 monoclonal antibodies.

112.    The collaboration between Genetics Institute, Honjo, and Ono regarding the PD-1/PD-L1 pathway and treatments to disrupt that pathway to upregulate the immune response, including to treat cancer and including with anti-PD-1 and anti-PD-L1 monoclonal antibodies, continued until November 2003, when the parties mutually agreed to terminate their Research and Development Collaboration Agreement.  In terminating their agreement, the parties agreed that each party retained a royalty-free, worldwide, non-exclusive license to use any patent rights necessary to develop, manufacture, or market any "new factors" and related products – which

include monoclonal antibodies that disrupt the PD-1/PD-L1 pathway – with the right to sublicense to third parties as necessary for such purpose.

113.    Counterclaim Plaintiffs are the successors-in-interest to, and owners of, all rights previously held by Genetics Institute in connection with the written agreements between and among Genetics Institute, Ono, and Honjo.

114.    An actual case or controversy exists between Counterclaim Defendants and Counterclaim Plaintiffs concerning whether Counterclaim Plaintiffs have a royalty-free, worldwide, non-exclusive license to practice the Disputed Patents based on the written agreements between and among Genetics Institute, Ono, and Honjo.

115.    A judicial declaration that Counterclaim Plaintiffs have a royalty-free, worldwide, non-exclusive license to practice the Disputed Patents under the written agreements between and among Genetics Institute, Ono, and Honjo is necessary and appropriate to resolve this controversy.

116.    Each of the Counterclaim Defendants knew or should have known that Counterclaim Plaintiffs had a royalty-free, worldwide, non-exclusive license to practice the Disputed Patents under the written agreements between and among Genetics Institute, Ono, and Honjo before initiating this civil action, rendering this an exceptional case entitling Counterclaim Plaintiffs to an award of all of their attorney fees incurred in connection with this case pursuant to 35 U.S.C. § 285.

## **Count IX**
### **(Declaratory Judgment Of Invalidity Of The '899 Patent Under 35 U.S.C. § 101)**

117.    Counterclaim Plaintiffs repeat and incorporate by reference the allegations in Counterclaim Paragraphs 1 through 116 as though fully set forth herein.

118.    One or more of the claims of the '899 patent is invalid under 35 U.S.C. § 101 because it is not drawn to patentable subject matter.

119.    In particular, one or more of the claims of the '899 patent is invalid under 35 U.S.C. § 101 because it seeks to claim a law of nature or natural phenomena regarding the PD-1/PD-L1 pathway in the human body, and thereby seeks to monopolize that pathway and preempt research into that pathway by others.

120.    An actual case or controversy exists between Counterclaim Defendants and Counterclaim Plaintiffs concerning the invalidity of one or more claims of the '899 patent under 35 U.S.C. § 101.

121.    A judicial declaration of the invalidity of one or more of the claims of the '899 patent under 35 U.S.C. § 101 is necessary and appropriate to resolve this controversy.

## PRAYER FOR RELIEF

WHEREFORE, Defendants and Counterclaim Plaintiffs pray for relief as follows:

A.    That Plaintiffs/Counterclaim Defendants take nothing by or from their Complaint;

B.    That the Court enter judgment against Plaintiffs/Counterclaim Defendants, and in favor of Defendants and Counterclaim Plaintiffs, and that the Complaint be dismissed in its entirety, with prejudice;

C.    That the Court correct the inventorship of the '899 patent and the other Disputed Patents under 35 U.S.C. § 256 to add Wood and Freeman as inventors;

D.    That the Court enter a declaratory judgment that Pfizer is a joint owner of the '899 patent and the other Disputed Patents under 35 U.S.C. § 262;

E.    That the Court enter a declaratory judgment that Counterclaim Plaintiffs have a royalty-free, worldwide, non-exclusive license to practice the '899 patent and the other Disputed

Patents under the written agreements between and among Genetics Institute, Inc., Ono, and

Honjo;

   F.  That the Court enter a declaratory judgment that one or more claims of the '899

patent are invalid under 35 U.S.C. § 101;

   G.  That the Court deem this an exceptional case under 35 U.S.C. § 285 and award

Defendants and Counterclaim Plaintiffs their costs and fees, including their attorney fees, in

connection with this case; and

   H.  That the Court award Defendants and Counterclaim Plaintiffs such other and

further relief as the Court deems just and proper.

## <u>REQUEST FOR JURY TRIAL</u>

   Correction of inventorship under 35 U.S.C. § 256 and the determination of patent

invalidity under 35 U.S.C. § 101 are issues of law to be determined by the Court sitting without a

jury.  For all other issues, Defendants and Counterclaim Plaintiffs demand a jury trial on all

issues so triable pursuant to Federal Rule of Civil Procedure 38.

         MORRIS, NICHOLS, ARSHT & TUNNELL LLP

         */s/ Jack B. Blumenfeld*

         _____
         Jack B. Blumenfeld (#1014)
         Maryellen Noreika (#3208)
         1201 North Market Street
         P.O. Box 1347
         Wilmington, DE  19899
         (302) 658-9200
         jblumenfeld@mnat.com
         mnoreika@mnat.com

         *Attorneys for Pfizer Inc., Wyeth LLC, Genetics*
         *Institute, LLC, EMD Serono, Inc., and Merck*
         *KGaA*

OF COUNSEL:

Peter J. Armenio, P.C.
Robert B. Wilson
Laura L. Fairneny
Anastasia M. Fernands
QUINN EMANUEL URQUHART &
  SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY  10010
(212) 849-7000

October 4, 2017

## <u>CERTIFICATE OF SERVICE</u>

   I hereby certify that on October 4, 2017, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

   I further certify that I caused copies of the foregoing document to be served on October 4, 2017, upon the following in the manner indicated:

Kelly E. Farnan, Esquire          *VIA ELECTRONIC MAIL*
Nicole K. Pedi, Esquire
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE  19801
*Attorneys for Plaintiffs*

Lisa M. Ferri, Esquire           *VIA ELECTRONIC MAIL*
Richard J. McCormick, Esquire
Manuel J. Velez, Esquire
Ying-Zi Yang, Esquire
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY  10020-1001
*Attorneys for Plaintiffs*

         */s/ Jack B. Blumenfeld*

         _____
         Jack B. Blumenfeld (#1014)